Electronically Filed
Intermediate Court of Appeals
CAAP-14-0001065
31-JAN-2019
07:49 AM

NO. CAAP-14-0001065

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
ROBERT L. TETU, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 13-1-0116)


SUMMARY DISPOSITION ORDER
(By: Fujise, Presiding Judge, and Leonard and Reifurth, JJ.)

Defendant-Appellant Robert L. Tetu appeals from the Judgment Guilty Conviction and Sentence, entered by the Circuit Court of the First Circuit ("Circuit Court") on August 13, 2014.[1]  Tetu was convicted by a jury of Unauthorized Entry into Motor Vehicle in the First Degree ("UEMV"), in violation of Hawaii Revised Statutes ("HRS") section 708-836.5 (Supp. 2012),[2] and Promoting a Dangerous Drug in the Third Degree ("PDD 3"), in violation of HRS section 712-1243 (Supp. 2012).[3]  The jury found Tetu not guilty of Unlawful Use of Drug Paraphernalia, pursuant to HRS section 329-43.5(a) (2010).

---

[1]   The Honorable Colette Y. Garibaldi presided.

[2]   Under the statute:

> A person commits the offense of [UEMV] if the person intentionally or knowingly enters or remains unlawfully in a motor vehicle, without being invited, licensed, or otherwise authorized to enter or remain within the vehicle, with the intent to commit a crime against a person or against property rights.

Haw. Rev. Stat. § 708-836.5(1).

[3]   Under the statute, "[a] person commits the offense of [PDD3] if the person knowingly possesses any dangerous drug in any amount."  Haw. Rev. Stat. § 712-1243(1).

On appeal, Tetu alleges that the Circuit Court erred in: (1) denying his April 10, 2014 ex parte motion for payment of litigation expenses ("Motion for Costs"); (2) denying his February 10, 2014 motion to compel discovery ("Discovery Motion"); (3) preventing him from mentioning to the jury that no video of the booking process was ever made available to him; (4) limiting his cross-examination and direct testimony about his offer to undergo a polygraph examination; and (5) entering a verdict that was not supported by the evidence.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, as well as the relevant statutory and case law, we affirm.

(1) In his first point of error, Tetu challenges the Circuit Court's[4] denial of the Motion for Costs in which he requested that the court direct payment of approximately $350 as litigation expenses, pursuant to HRS section 802-7,[5] to cover service and transportation costs to compel Hawai'i County Police Officer Jody Buddemeyer's[6] testimony under subpoena. The Motion for Costs alleged that Officer Buddemeyer's "testimony appears necessary to an adequate defense," as supported by "the entire record," and an attached declaration of counsel ("Declaration"), in which counsel explained:

> 2.    Defendant is unable to pay defense counsel or for litigation expenses.
>
> . . . .
>
> 4.    The defense maintains that witness Jody [Buddemeyer], a Hawaii County Police Officer who was employed by the Honolulu Police Department at the time of the alleged offense, will provide exculpatory testimony.

---

[4]    The Honorable Richard K. Perkins presided.

[5]    Under HRS section 802-7 (1993), the court may authorize the use of court funds to pay various costs on behalf of an indigent criminal defendant, so long as the defendant makes a "satisfactory showing that [he] is unable to pay" those costs himself, *and* "upon a finding that the same are necessary for an adequate defense[.]" (Emphasis added.)

[6]    At the time of Tetu's arrest, Officer Buddemeyer was the "property officer" in the Honolulu Police Department's ("HPD") Central Receiving Division ("CRD"). Subsequent to Tetu's arrest, but prior to the trial, Officer Buddemeyer moved to the island of Hawai'i, where he worked for the Hawai'i County Police Department.

. . . .

6.      [Tetu] was initially arrested for UEMV, then taken to the police station.  During processing as an arrestee, his large backpack was x-ray scanned.

7.      Nevertheless, in requesting a warrant to search the backpack, the police informed the Court that they would only seek evidence related to the UEMV; there was no mention of drugs or paraphernalia.

8.      When the search was executed, the officers found a glass pipe with methamphetamine residue.

9.      At the time the search warrant was requested, the officers apparently did not mention any drugs or paraphernalia in the backpack, even after x[-]ray screening at the station.

10.     Accordingly, either the machine missed the [drug paraphernalia] or [it] was not in the backpack, and the finder of fact must be informed about the screening process as well as the receiving officer's actions and knowledge in order to resolve the question of reasonable doubt.

Although contending that Officer Buddemeyer would "provide exculpatory testimony," the Declaration did not articulate a theory that the drug paraphernalia might have been planted in Tetu's backpack after the UEMV arrest, or explain what Officer Buddemeyer would have said,[1] whether counsel had interviewed (or attempted to interview) Officer Buddemeyer to determine his likely testimony, how his testimony was "necessary to an adequate defense" against Tetu's drug charges (the only argument asserted at this stage of the proceedings), any alternatives available to obtain the desired information, or the relationship between Officer Buddemeyer's expected testimony and Tetu's inability to otherwise introduce evidence in support of his then-current theory that the search warrant was invalid.  It was not until the subsequent hearing on Tetu's Discovery Motion that defense counsel began to articulate his theory that the paraphernalia might have been planted.  *See* n.8 infra.

Therefore, Tetu fails to demonstrate that Judge Perkins "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to [Tetu's] substantial detriment"

---

[1]      *C.f. State v. Reed*, 77 Hawai'i 72, 84, 881 P.2d 1218, 1230 (1994) (requiring, in the case of an ineffective assistance of counsel claim for failure to call a witness at trial, sworn statements from the prospective witness, because in the absence of such a sworn statement, defendant's "characterization of their potential testimony amounts to nothing more than speculation and, therefore is insufficient to meet his burden[.]")

3

by denying the request for litigation expenses. *See State v. Hoopii*, 68 Haw. 246, 248-49, 710 P.2d 1193, 1195 (1985) (holding that it was not an abuse of discretion to deny expert witness funds under HRS section 802-7 when defendant contended that his counsel could not prepare his defense without the aid of his own mental health expert); *State v. Akana*, No. CAAP-10-0000061, 2011 WL 4426891, at *1-2 (Haw. Ct. App. Sept. 22, 2011) (holding that the trial court did not abuse its discretion in denying defendant's motion for funds when defendant failed to establish that the services of a forensic psychologist were necessary for an adequate defense).

(2)  In his second point of error, Tetu appears to challenge the Circuit Court's February 18, 2014 "Findings of Fact, Conclusions of Law, and Order Denying Defendant's Motion to Compel Discovery."  In his Discovery Motion, Tetu sought an order compelling the State to obtain and produce guidelines and/or protocol for the x-ray machine in the CRD's receiving area. Furthermore, Tetu also appears to challenge the Circuit Court's oral ruling on the State's Motion In Limine No. 1 ("MIL 1"), which in part sought to exclude the use or testimony regarding the protocol for the x-ray machine.  In it's ruling, the Circuit Court determined that the issue as to "whether the [x-ray] machine can detect certain substances such as glass or liquids," was not relevant, but "what is relevant is what is the purpose of the x-ray review, and what is the protocol, and what are they looking for, essentially."  Even if we assume for purposes of argument that the evidence Tetu sought was relevant, any error in denying him access to it was harmless beyond a reasonable doubt because the court's ruling did not preclude Tetu from furthering his defense that a third-party placed paraphernalia in his backpack post-arrest, the apparent purpose behind his Discovery Motion and the counter-argument made during the hearing on MIL 1.[8/]  *See State v. McCrory*, 104 Hawaiʻi 203, 210, 87 P.3d 275, 282

---

[8/]    Although the Circuit Court assumed during the hearing on Tetu's Discovery Motion that Tetu planned to use the evidence he sought to challenge the seizure by attacking the search warrant, the record on appeal reveals that the Discovery Motion actually sought evidence to circumstantially establish the fact that Tetu had never exercised conscious control of the drug paraphernalia.  *See generally Kaeo v. Davis*, 68 Haw. 447, 456, 719 P.2d 387,

(2004).

At the hearing on the Discovery Motion, defense counsel argued that the fact that nothing was mentioned about any drug-offense at the time HPD applied for the search warrant "would suggest to us that there was no drug paraphernalia or drugs detect -- discernible on the x-ray scan, otherwise that would've also found its way into the search warrant application. So . . . if it was not detected, we're thinking either it wasn't there or the machine missed it[.]" Similarly, at the hearing on MIL 1, defense counsel reiterated that, "from the defense side," the issue is "if an x-ray machine is capable of detecting contraband which is made out of glass, why wasn't it found at that time?" This reasoning, however, overlooks the possibility that even if the x-ray machine could detect glass, the officer who sent Tetu's backpack through the x-ray machine, may not have been looking for contraband during the subject-x-ray scan.

The Circuit Court's ruling on MIL 1 addressed this possibility, determining that "what is relevant is what is the purpose of the x-ray review, and what is the protocol, and what are they looking for, essentially[,]" and therefore, allowing Tetu the opportunity to cross-examine HPD officers on the matter.[9] Tetu took advantage of this opportunity, questioning Officer Mark Fiesta—who inferred that the x-ray machine was capable of detecting glass—and Detective Michael Fisher about HPD protocol and what kind of objects they look for during the x-ray scan of a suspect's property.[10] Additionally, Tetu was able to

---

393 (1986) (emphasizing the importance of "[t]he purpose for which the evidence is offered" in order to determine relevancy (quoting McCormick on Evid. § 200, at 587 (7th ed.))).

[9]    The Circuit Court explained

The issue is not -- it would appear is not whether the machine can detect certain substances such as glass or liquids. I guess the function here is, based on HPD protocol, what are they looking for? I mean, what is the purpose, actually, of actually having it go through the x-ray machine? That's the relevant question, so I would allow that. . . . As to what it can -- why can't it see glass . . . . that's not relevant.

[10]    According to Officer Fiesta, who has occasionally worked as a "property officer" and is therefore familiar with how to operate the x-ray machine, the property officer x-rays the property in order to "[l]ook[] for

further his defense that he did not possess the drug paraphernalia before HPD discovered it, maintaining that nobody notified him of any drugs or drug paraphernalia when his backpack went through the x-ray machine, and providing conflicting testimony as to whether he saw any HPD officers open his backpack, but ultimately admitting that he did not see anyone open his backpack from his arrest up until his arrival at the police station.

Accordingly, "in light of the entire proceedings and given the effect to which the whole record shows it is entitled," there is no "reasonable possibility that [the absence of the requested-materials Tetu sought in his Discovery Motion and/or the Circuit Court's subject-ruling on MIL 1] contributed to [Tetu's PDD 3] conviction." *McCrory*, 104 Hawai'i at 210, 87 P.3d at 282 (emphasis and internal quotation marks omitted); *cf. State v. White*, 92 Hawai'i 192, 205, 990 P.2d 90, 103 (1999) (determining that the trial court erred in denying defendant's motion to compel discovery on relevancy grounds, but holding that such error was harmless in light of proffered testimony which addressed the underlying purpose of the requested-material and in light of the fact that the denial of discovery request did not preclude defendant from furthering his defense). Consequently, even if the Circuit Court erred as to relevancy, any such error was harmless beyond a reasonable doubt, and Tetu's second point of error is without merit.

(3) In his third point of error, Tetu appears to allege that the Circuit Court erred by failing to, *sua sponte*, sanction the State for alleged destruction of video evidence and/or dismiss the case on these grounds. Tetu argues that if preserved, the video evidence from CRD's receiving-area cameras would have debunked the testimony regarding his alleged

---

weapons, any perishables, just anything that can't be -- that is not supposed to be brought into [CRD]," for example, "*contraband*" *such as "a cylindrical object with a bulbous end*," like a glass pipe. (Emphasis added.) But according to Detective Fisher, who has worked as "an SSD officer, a crew officer, [and] a narcotics officer" over the course of his 26-year career with the HPD, officers will x-ray any bag brought into the CRD "*just to see if there's a firearm or a bomb, basically, in there. That's the only thing they're looking for.*"(Emphasis added.)

6

statement, "I always sleep in that car." The availability of such an argument, however, depends on whether the State did, in fact, fail to preserve evidence material to Tetu's guilt or innocence, thereby violating Tetu's due process rights. *See State v. Diaz*, 100 Hawai'i 210, 225, 58 P.3d 1257, 1272 (2002).

Several factors limit the *Brady* rule which protects a defendant's due process rights against the destruction of evidence; *see Brady v. Maryland*, 373 U.S. 83, 87 (1963); *State v. Matafeo*, 71 Haw. 183, 185-86, 787 P.2d 671, 672 (1990) (incorporating the *Brady* rule into Hawai'i due process jurisprudence); and which authorizes dismissal upon the destruction of evidence "so critical to the defense as to make a criminal trial fundamentally unfair without it." *State v. Steger*, 114 Hawai'i 162, 170, 158 P.3d 280, 288 (App. 2006) (quoting *Matafeo*, 71 Haw. at 187, 787 P.2d at 673) (internal quotation marks omitted). These factors include the following: "defense knew of the existence of certain [evidence] prior to the trial, no attempt was made to seek the assistance of the court in obtaining the [evidence], there was no request for a continuance, and the defendant failed to demonstrate prejudice as a result of the [evidence] being suppressed." *Diaz*, 100 Hawai'i at 226, 58 P.3d at 1273. Each of these factors is present.[11/] Accordingly, Tetu has not demonstrated that any alleged destruction of video recordings warrants dismissal or sanction under the *Brady* rule.

Tetu additionally argues that he was wrongfully precluded from mentioning to the jury of the alleged destruction of the video evidence. Tetu's argument does not comport with HRAP Rule 28(b)(4) and (7) as he does not identify where in the record the Circuit Court made a ruling that precluded him from further elucidating that the video was lost, nor does he provide

---

[11/]    For example, Tetu's pre-trial testimony establishes that the defense knew prior to trial that video recording evidence might exist, but there is no indication that the defense petitioned the court for assistance in obtaining that evidence. Nor does the record indicate that the defense moved for a continuance on these grounds. Furthermore, the record on appeal contains no evidence to suggest that the alleged video evidence, if preserved, would have—or even *could* have—corroborated Tetu's contention that he did not make the alleged statement. That is, no witnesses had personally viewed any video recordings from January 26, 2013, nor did they know if the CRD's video cameras recorded audio.

any citations to the record, and he concedes that he did not argue the issue below. We, therefore, decline to address the matter further. *See generally, Kamaka v. Goodsill Anderson Quinn & Stifel*, 117 Hawai'i 92, 114 n.23, 176 P.3d 91, 113 n.23 (2008) ("This court is not obligated to sift through the voluminous record to verify an appellant's inadequately documented contentions." (quoting *In re Guardianship of Carlsmith*, 113 Hawai'i 211, 234-35, 151 P.3d 692, 715-16 (2007) (internal quotation marks and brackets omitted))); *Asato v. Procurement Policy Bd.*, 132 Hawai'i 333, 354 n.22, 322 P.3d 228, 249 n.22 (2014) (citing *State v. Moses*, 102 Hawai'i 449, 456, 77 P.3d 940, 941 (2003) which states, "As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal[.]").

(4) In his fourth point of error, Tetu alleges that the Circuit Court prevented him from exercising his right of confrontation under Art. 1, section 14 of the Constitution of the State of Hawaii and Amendment VI to the U.S. Constitution by limiting cross-examination and direct testimony regarding his offer to undergo a polygraph examination. More specifically, Tetu argues that "[t]here is far less potential for speculation or misrepresentation where the defense seeks to question on polygraph merely to show why the test was not done, and the extent to which this failure may have angered the police." Tetu's arguments are unpersuasive.

> Article I, section 14 of the Hawai'i Constitution and the sixth amendment to the United States Constitution guarantee criminal defendants the right to be confronted with *witnesses* against them. Implicit in a defendant's right to confront witnesses against him, is his right to cross-examine and to impeach the confronted *witness.*

*State v. Cordeiro*, 99 Hawai'i 390, 420, 56 P.3d 692, 722 (2002) (internal quotation marks, citation, and brackets omitted) (emphasis added) (quoting *State v. Okumura*, 78 Hawai'i 383, 399, 894 P.2d 80, 96 (1995)).

Here, the Circuit Court did not limit Tetu with respect to his questioning of *other witnesses.* Rather, the Circuit Court made a pre-trial relevancy determination that any reference to Tetu's alleged offer/agreement to take a polygraph test was

irrelevant and inadmissible, and then the court enforced that ruling by sustaining an objection to Tetu's own reference to the polygraph while he was testifying in his defense. Tetu therefore fails to demonstrate that the Circuit Court violated his right of confrontation. Furthermore, it is well-established in our jurisdiction that "a person's 'willingness or unwillingness to take [a polygraph] test is inadmissible at trial.'" *Doe v. Doe*, 120 Hawai'i 149, 176, 202 P.3d 610, 637 (App. 2009) (emphasis omitted) (quoting *State v. Chang*, 46 Haw. 22, 33-34, 374 P.2d 5, 12 (1962)), *overruled on other grounds by Okumura*, 78 Hawai'i 383, 894 P.2d 80. The Circuit Court's rulings regarding the polygraph references were therefore harmless in any case.

Accordingly, the Circuit Court did not err by ruling that any reference to the polygraph examination would be irrelevant, and the court did not err by enforcing that ruling and striking Tetu's comment that referred to the polygraph from the record.

(5) In his final point of error, Tetu alleges that his due process rights under Art. 1, sections 5 and 14 of the Hawai'i Constitution and Amendments V and XIV of the U.S. Constitution were violated as his guilty verdict was not supported by the evidence. With respect to both the PDD 3 and UEMV conviction, we hold that there was sufficient evidence to support the guilty verdicts.

With regard to the UEMV-offense, a witness observed a man inside of the vehicle belonging to the complaining witness ("CW"), holding a light and shining it around "like he was looking for something." While the incident was in progress, the witness approached the vehicle and spoke to the man and was able to get a good look at the man's face from "three to four feet" away. The man had a black backpack, his hair was in a ponytail, and he had a stick. After following the man on foot and briefly losing him, the witness spotted Tetu—with "the same ponytail, the same bottle of Gatorade, the same large stick, and the same backpack"—in a small alcove of a building about a block away from the vehicle; and when the police arrived, the witness identified Tetu as the same man he had seen in the CW's vehicle. Later, the

police discovered that someone had broken into that same vehicle, likely by way of a large cut or tear in the canvas fabric on its passenger side, and that a cellular phone charger and some coins, among other things, from inside it were missing.  Tetu cooperated with the police and readily surrendered a knife that was in his front pocket.  The police also located a flashlight—that apparently has sentimental value to Tetu—and brought it to the CRD with Tetu and his backpack.  After detectives obtained a search warrant for Tetu's backpack, they recovered loose change and two phone chargers, one of which the CW identified as her own based on "the brand name and the twisty tie" attached to it. The CW also confirmed that she did not know Tetu, nor had she given him permission to enter her vehicle.

With regard to the PDD 3-offense, Detective Fisher testified that Tetu came in with a black backpack "full to the rim of property," that he executed a search warrant for the backpack, that he found "one glass cylindrical pipe with bulbous end . . . appeared to be clear or not tainted with anything, and . . . another pipe which was cracked with what appeared to be white residue . . . [that] could be narcotics[,]" and that he immediately recognized the pipes as those "commonly used for smoking crystal meth."  Tetu admitted that he had a black backpack and "[a]s far as [he knew]" all the contents inside belonged to him, but claimed that there was no glass pipe in his backpack.  Additionally, the jury received the Stipulation as to Evidence, establishing that from its seizure up until the time it was analyzed and tested, the drug paraphernalia was not substituted, altered, or otherwise tampered with, and per an HPD chemist's determination, the substance found on the paraphernalia was methamphetamine.

Viewing the evidence in the light most favorable to the State, as we must, State v. Matavale, 115 Hawai'i 149, 158, 166 P.3d 322, 331 (2007) (quoting State v. Moniz, 92 Hawai'i 472, 475, 992 P.2d 741, 744 (App. 1999)); this evidence, which the jury found to be credible, was of "sufficient quality and probative value to enable a person of reasonable caution" to make the requisite finding in order to convict Tetu of UEMV and of PDD

3. *State v. Griffin*, 126 Hawai'i 40, 56, 266 P.3d 448, 464 (App. 2011) (quoting *State v. Richie*, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998)) (internal quotation marks omitted); *State v. Eastman*, 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996) (quoting *State v. Pone*, 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995)); *see* Haw. Rev. Stat. § 708-836.5(1) ("A person commits the offense of [UEMV] if the person intentionally or knowingly enters . . . a motor vehicle, without being . . . authorized to enter . . . with the intent to commit a crime against . . . property rights."); Haw. Rev. Stat. § 712-1243(1) ("A person commits the offense of [PDD 3] if the person knowingly possesses any dangerous drug in any amount."). Tetu's UEMV and PDD 3 convictions were, therefore, supported by substantial evidence.

Therefore, IT IS HEREBY ORDERED that the August 13, 2014 Judgment Guilty Conviction and Sentence entered by the Circuit Court of the First Circuit is affirmed.

DATED: Honolulu, Hawai'i, January 31, 2019.

On the briefs:

Stuart N. Fujioka
for Defendant-Appellant.

Donn Fudo,
Deputy Prosecuting Attorney,
City & County of Honolulu,
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge